**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**GENETTA VICTORIA COLEMAN,**

     **Plaintiff,**

**vs.**                         **CIVIL ACTION NO. 3:16-CV-12614**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disabled Widow's Benefits (DWB) and for Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered October 24, 2017 (Document No. 11.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 9 and 10.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 9.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 10.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

1

**Procedural History**

The Plaintiff, Genetta Victoria Coleman (hereinafter referred to as "Claimant"), protectively filed her application for Title XVI benefits on November 14, 2013, and her application for Title II benefits on December 17, 2013 alleging disability in both applications since February 1, 2001 because of "COPD, heart condition, angina, depression, spinal stenosis, scoliosis, disc problems in back, degenerative arthritis, memory loss, dental problems, hearing loss, and potential diabetes ." (Tr. at 341-346, 347-355, 390.) Her claims were initially denied on April 17, 2014 (Tr. at 202-212, 213-218, 219-223.) and again upon reconsideration on May 22, 2014. (Tr. at 227-233, 234-240.) Thereafter, Claimant filed a written request for hearing on June 25, 2014. (Tr. at 241-243.)

An administrative hearing was held on May 14, 2015 before the Honorable John M. Dowling, Administrative Law Judge ("ALJ"). (Tr. at 30-68.) On July 24, 2015, the ALJ entered an unfavorable decision. (Tr. at 8-29.) On September 25, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 449-454.) The ALJ's decision became the final decision of the Commissioner on October 26, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On December 28, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 7 and 8.) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (Document No. 9.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 10.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 48 years old as of the amended alleged onset date, a "younger person", and attained the age of 51 at the time of the ALJ's decision, thereby transitioning into a "person closely approaching advanced age." See 20 C.F.R. §§ 404.1563(c)-(d), 416.963(c)-(d). (Tr. at 22.) Claimant has a high school education, completed three years of college, and has specialized training as a secretary. (Tr. at 391.) Claimant last worked full time in 2000 at a pharmacy warehouse doing receiving and back stock, and she worked briefly part time in 2003. (Tr. at 37-38.)

The record indicates that Claimant filed for Title XVI benefits seven times previously, and for Title II disability benefits twice previously, however, it was determined that she did not meet the insured status for Title II purposes.[1] (Tr. at 91-92.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

In this particular case, Claimant must prove that she is the widow of the deceased worker, has attained the age of 50, is unmarried, and has a disability that began before the end of the prescribed period. 20 C.F.R. § 404.335(c)(1). The prescribed period ends with the month before

---

[1] The Commissioner has pointed out that this Court affirmed the final decisions finding Claimant not disabled in Claimant's prior appeals: Coleman v. Colvin, No. 3:13-CV-23805, 2015 WL 764023 (S.D.W. Va. Feb. 23, 2015) (Magistrate Judge Eifert); Coleman v. Astrue, No. 3:10-CV-1254, 2011 WL 3924187 (S.D.W. Va. Sept. 7, 2011) (Magistrate Judge Eifert).

the month in which the claimant attains age 60, or, if earlier, either 7 years after the worker's death or 7 years after the widow was last entitled to survivor's benefits, whichever is later. Id.

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§

404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

In this case, the ALJ determined that Claimant was previously found that she is the unmarried widow of the deceased insured worker and had attained the age of 50. (Tr. at 14, Finding No. 1.) The ALJ next determined that the prescribed period for widow's benefits ended on November 30, 2014. (Id., Finding No. 2.)

The ALJ then found that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the amended alleged onset date of May 31, 2012. (Id., Finding No. 3.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease; coronary artery disease status post-stent placement; osteoarthritis; and chronic obstructive pulmonary disease ("COPD"). (Id., Finding No. 4.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 17, Finding No. 5.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work:

> except the claimant must be able to alternate from sitting and standing positions at will so long as they remain productive. The claimant can occasionally climb ramps or stairs, and never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, or crouch, and never crawl. The claimant must avoid concentrated exposure to extreme heat, extreme cold, excessive vibration, fumes, dusts, gases, and poorly ventilated areas. The claimant must avoid all exposure to unprotected heights and hazardous machinery.

(Id., Finding No. 6.)

At step four, the ALJ found Claimant was unable to perform her past relevant work. (Tr. at 22, Finding No. 7.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 22-23, Finding Nos. 8-11.) Finally, the ALJ determined Claimant had not been

under a disability from May 31, 2012 through the date of the decision. (Tr. at 24, Finding No. 12.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that she "grids out" on her 50th birthday pursuant to Medical-Vocational Rule 201.12. (Document No. 9 at 5.) Based on the record of evidence, Claimant is limited to sedentary work, at best, not light work as found by the ALJ. (Id. at 6-7.) Claimant asserts that the ALJ disregarded the medical source evidence and Claimant's credible testimony, rendering a decision that is not based upon substantial evidence. (Id. at 7.) Claimant asks the Court to reverse the decision below and to award her benefits as of her 50th birthday, November 22, 2013, or alternatively, to remand for further proceedings and grant her costs expended herein. (Id. at 7-8.)

In response, the Commissioner argues that the ALJ correctly found Claimant was capable of a limited range of light work, providing her a sit/stand option that precluded application of Rule 201.12; he did not find that she could stand or walk for six hours during an eight hour workday. (Document No. 10 at 11-13.) Given a hypothetical including Claimant's background and limitations, the vocational expert testified that there were other jobs Claimant could do, therefore the ALJ's conclusions were based upon the substantial evidence. (Id. at 14.) The Commissioner also states that although Claimant references certain evidence of record in support of her argument, none of it provides any functional limitations that support her allegations she has restrictions in walking or sitting. (Id.)

In addition to the medical evidence, the ALJ reviewed Claimant's activities of daily living, the lack of specialized treatment as well as the medical opinions that supported his conclusion that she could perform a modified range of light work. (Id. at 15.) With respect to Claimant's emphasis on Dr. James P. Wagner's November 2011 opinion, the Commissioner contends that she relied on

8

this argument in her previous appeals to this Court: Magistrate Judge Eifert already found the prior ALJs properly evaluated the opinion because it did not provide any functional limitations; was rendered before her alleged onset date; was vague; and was inconsistent with his own treatment records.[3] (Id. at 15-16.)

The Commissioner also argues that Claimant's request for an award of payment must be rejected because remand to the Commissioner is the proper remedy, as the Court is generally precluded from undertaking the Agency's role in investigation and weighing the evidence. (Id. at 17.) Finally, the Commissioner asserts the final decision is supported by substantial evidence and asks the Court to affirm. (Id. at 18.)

### The Relevant Evidence of Record[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

#### Primary Care Physician Medical Records:

The majority of the medical records for the pertinent period are from Claimant's primary care physician, James P. Wagner, D.O. On June 6, 2012, Dr. Wagner examined Claimant for reported lower back pain. (Tr. at 734.) It was noted Claimant was still smoking. (Id.) Dr. Wagner reported that Claimant took Metoprolol, Ultram, Lasix, KT, Flonase, Lyrica, and used ProAir. (Id.) On examination, Dr. Wagner observed clear auscultation, anxiety, and reported no observations concerning Claimant's extremities or her neurological conditions. (Id.) He diagnosed her with

---

[3] Though Claimant does not argue that the ALJ erred in his evaluation of this medical opinion, as she maintains that Rule 201.12 provides for a finding that she is disabled (Document No. 9 at 5.), the undersigned notes that the ALJ herein likewise assigned "little weight" to Dr. Wagner's opinion, providing similar reasons for his evaluation as the prior ALJ. (Tr. at 22, 107-108.)
[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

angina and asthma. (Id.)

On October 10, 2012, Claimant returned to Dr. Wagner for a "Medicaid phys[ical]." (Tr. at 733.) She reported bilateral knee pain and back pain, though Dr. Wagner did not perform an examination, and offered no diagnoses. (Id.)

On July 2, 2013, Claimant returned to Dr. Wagner complaining of pain in both legs. (Tr. at 732.) On examination, her breathing was normal, and Dr. Wagner made no observations concerning her psychiatric symptoms, her extremities, or her neurological conditions. (Id.) He diagnosed her with atherosclerosis and ordered a bilateral ankle brachial index. (Id.)

On July 10, 2013, Claimant underwent a peripheral vascular artery sonography test to assess her atherosclerosis. (Tr. at 568.) "There was no evidence of hemodynamically significant stenosis in either lower extremity with an [ankle-brachial index] ABI on the right of 1.19 and ABI on the left of 1.11." (Id.) On July 30, 2013, Claimant returned to Dr. Wagner to discuss her labs. (Tr. at 731.) He discussed her high lipids and refilled her prescriptions. (Id.) On examination, Dr. Wagner observed clear lungs, and made no observations concerning her extremities; her neurological examination was normal. (Id.)

On November 18, 2013, Claimant had clear lungs on examination, her glucose was "a little high," her back hurt "some," and her anxiety was "bad." (Tr. at 730.) On examination, Dr. Wagner observed clear auscultation, anxiety, and made no observations concerning her extremities; he noted her neurological examination was normal and refilled her prescriptions. (Id.)

On December 10, 2013, Claimant reported back pain, anxiety, and asthma. (Tr. at 771.) On examination, Dr. Wagner observed clear auscultation, anxiety, and made no finding with respect to Claimant's extremities; her neurological examination was normal. (Id.) He diagnosed Claimant

with hyperlipidemia, asthma, anxiety, type II diabetes, and chronic back pain and refilled her medications. (Id.)

On March 24, 2014, Claimant underwent x-rays of her lumbar spine, which showed severe degenerative disc disease at L5-S1, mild scoliosis, and no compression fractures. (Tr. at 745.)

On May 29, 2014, Claimant returned to Dr. Wagner for a recheck/refill appointment; she complained of bronchitis, but stated that her asthma was fair, and that her back stull hurt. (Tr. at 770.) Her extremities and neurological examinations were normal, but Dr. Wagner observed anxiety and wheezing. (Id.) He diagnosed Claimant with hyperlipidemia, asthma, anxiety, chronic back pain, and acute bronchitis. (Id.) Dr. Wagner prescribed pravastatin, Tricor, ProAir, Lyrica, Valium, and Ultram. (Id.)

On July 14, 2014, Suresh K. Agrawal, M.D., examined x-rays of Claimant's chest in relation to her COPD. (Tr. at 766.) Dr. Agrawal compared the view with those from February 2011 and observed "some additional haziness" but otherwise "[n]o significant change from 2/17/2011." (Id.) Dr. Agrawal concluded that it was an "[o]therwise unremarkable examination." (Id.)

During a September 8, 2014 recheck/refill appointment, Dr. Wagner diagnosed asthma, hyperlipidemia, anxiety, and chronic back pain, and continued her prescriptions. (Tr. at 769.) On examination, he observed clear auscultation and knee pain, and Claimant's neurological examination was normal. (Id.)

On December 3, 2014, Claimant told Dr. Wagner that her back pain was worse but her anxiety was the same. (Tr. at 768.) He diagnosed Claimant with hyperlipidemia, asthma, anxiety, and chronic back pain and continued her medications. (Id.) He made no observations concerning her extremities or neurological conditions. (Id.)

11

Claimant returned for a "recheck" appointment with Dr. Wagner on February 26, 2015. (Tr. at 767.) She reported that she needed her prescriptions refilled and that she had hurt her back. (Id.) Dr. Wagner diagnosed her with hyperlipidemia, asthma, anxiety, and chronic back pain with acute exacerbation. (Id.) He made no observations concerning her extremities or neurological conditions. (Id.)

Consultative Examinations:

On March 29, 2014, William C. Steinhoff, M.A., DDS examiner, provided a mental profile of Claimant. (Tr. at 754-759.) It was noted that Mr. Steinhoff had no records available at the time of his examination. (Tr. at 755.) Mr. Steinhoff observed Claimant to be poorly groomed with moderate body odor noted, unkempt hair and appeared older than her stated age. (Tr. at 754.) She was cooperative during his interview and reported that she has COPD, heart problems with leaky valves, three blockages in her arteries, and spinal stenosis with a lot of pain. (Tr. at 754-755.) She reported her onset in 2001 when she hurt her back, but she was also let go from her employment due to downsizing. (Tr. at 755.) Claimant also stated that her sleep was poor, that she had crying spells, low energy level and a poor appetite; she felt nervous, especially in crowds, and also depressed. (Id.)

Claimant reported that she received outpatient mental health treatment at Prestera Center after her husband died, but none recently. (Id.) She reported trying to quit smoking, and down to four cigarettes per day, but she did not start until 2004. (Id.)

For the mental status examination, Claimant demonstrated clear and coherent speech, oriented in all spheres, depressed mood and restricted affect; she appeared preoccupied with pain, but Mr. Steinhoff found no evidence of an active thought disorder. (Tr. at 756.) Her insight was

limited; judgment average; immediate and remote memory within normal limits, but recent memory markedly impaired. (Id.) Her concentration was noted to be adequate, her pace mildly slow, and her persistence mildly impaired. (Tr. at 756-757.) Mr. Steinhoff found Claimant's social functioning mildly impaired secondary to her depression and anxiety. (Tr. at 757.) Claimant was "rather vague" in describing a typical day, but reported getting out of bed between 4:30 – 5:00 a.m., drinking coffee, letting out the dog, watching TV, and then writing, but stops when her hands hurt. (Id.) She tries to crochet some. (Id.) She performs her personal care once or twice per week, microwaves meals mostly, and does housecleaning with her son's help. (Id.) She sweeps and does the laundry, and her son does the yard work. (Id.) She reported driving short distances once a week on average and she will sit outside with her granddaughter if the weather permits, or watches TV and plays with her indoors. (Id.)

Mr. Steinhoff gave Claimant a poor to guarded prognosis, and opined she was capable of managing her own funds or finances if awarded benefits. (Tr. at 759.)

On April 4, 2014, Robert Holley, M.D., DDS examiner, performed a physical examination of Claimant. (Tr. at 750-753.) Claimant reported recurrent chest pain, which radiated into her left arm. (Tr. at 750.) She also reported constant burning pain in her cervical, thoracic, and lumbar spine, which radiated to her right wrist. (Tr. at 751.) She reported smoking one to two packs per day and minimal exercise. (Id.)

On examination, Dr. Holley observed Claimant to be slightly obese and in no acute distress. (Id.) She had 20/70 corrected vision in both eyes. (Id.) Her heart examination was normal, although she had physiologic splitting of S2, but not in S3 or S4, and she had no gallop. (Tr. at 752.) Claimant had tenderness over her spine and a slightly antalgic gait. (Id.) She had normal sensation

and reflexes, except for apart from lightly decreased distal foot sensation. (Id.)

Claimant had slightly diminished right shoulder range of motion and pain, and as well as decreased range of motion thought her wrists, hands, and elbows. (Id.) She could make fists, and had normal fine manipulation, grip strength, and upper extremity strength. (Id.) Claimant had flexion and extension in her knees to 120 degrees on the right and 105 on the left, with hip flexion to 30 degrees on the right and 80 degrees on the left. (Id.) She had reduced range of motion her hips and ankles. (Tr. at 753.)

Claimant had cervical spine lateral flexion to 40 degrees, flexion to 60 degrees, extension to 75 degrees, bilateral rotation to 80 degrees with no pain. (Id.) She had lumbar flexion to 60 degrees, lateral flexion to 20 degrees on the right and 18 degrees on the left with pain, and negative straight leg raise testing. (Id.) She had 5/5 lower extremity muscle strength; pain limited her to 50 percent squatting and decreased bilateral heel and toe walk. (Id.) She had moderate difficulty standing, walking, and mounting the examination table. (Id.) She did not need a cane to walk (Id.)

Opinion Evidence:

In November 2011, Dr. Wagner provided a physical examination of Claimant at the request of the West Virginia DHHR. (Tr. at 583-586.) Dr. Wagner listed Claimant's diagnoses as asthma, chronic back pain, arthritis of the knees, and angina. (Tr. at 584.) He assessed her posture as erect and gait as normal. (Id.) Dr. Wagner described daily pain in her back and knees; he provided no other description of Claimant's limitations but concluded "I don't think she can do full time work," and opined that he did not expect her conditions to improve. (Tr. at 585.)

On May 9, 2014, State agency medical consultant Fulvio Franyutti, M.D., prepared a physical residual functional capacity assessment. (Tr. at 132-134.) Dr. Franyutti determined that

Claimant could stand and/or walk for about six hours in an eight-hour day, and sit for six hours in the same amount of time. (Tr. at 132.) He opined that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, and had no push/pull limitations. (Id.) Dr. Franyutti also concluded that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but could never crawl or climb ladders, ropes, and scaffolds. (Tr. at 133.) He opined that Claimant must avoid concentrated exposure to extreme heat, extreme cold, vibration, and pulmonary irritants, and must avoid exposure to hazards. (Id.) In sum, Dr. Franyutti determined that Claimant could work at the light exertional level. (Tr. at 132, 135.)

On May 13, 2014, on reconsideration, State agency medical consultant Curtis Withrow, M.D., evaluated the record and affirmed Dr. Franyutti's assessment that Claimant could perform a modified range of light exertional work. (Tr. at 160-161, 163-165.)

On May 19, 2014, Cindy Osborne, D.O., performed a case analysis at the reconsideration level. (Tr. at 191.) Dr. Osborne affirmed Drs. Franyutti and Withrow's physical residual functional capacity assessments. (Id.) Dr. Osborne evaluated Claimant's vision, observing that her past vision testing was over twelve months old, but otherwise determined that the medical findings "appear to be consistent with the RFC as set at light RFC." (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she was injured on the job, was on medical leave for two months, and returned to work part-time for two months. (Tr. at 39, 755.) She was then laid off during a reduction in force. (Tr. at 38-39, 755.) She then babysat and did part-time inventory work, but she did not return to full-time work, because of her knees and back. (Tr. at 39-40.) She testified that

she had lost weight by eliminating sugar and no longer eating fried foods; she admitted that she was advised to lose weight to help with her back and knees. (Tr. at 36-37.)

Claimant testified that she was raising her granddaughter, and sometimes her granddaughter's mother takes her on weekends. (Tr. at 36.) Claimant fed, bathed, played with, and generally took care of her granddaughter, with her son's help except for the bathing part. (Tr. at 36, 51.) Her daughter will also come over and help bathe her granddaughter since Claimant can no longer lift her. (Tr. at 51-52.) When she is having a bad day, her granddaughter tries to cheer her up, and knows to bring whatever they will play with to the couch since Claimant cannot get on the floor. (Tr. at 51.) Claimant will fix oatmeal or something easy for her. (Id.)

Claimant has a cane and uses it all day, it was not prescribed to her, but she testified that it helped with walking and getting up and down from chairs. (Tr. at 40-41.) She experienced constant pain in her back from her tailbone up between her shoulders, and weekly chest pain that sometimes make her fingertips go numb. (Tr. at 44-45.) If she moves her arms a lot, she gets shoulder pain towards her neck and cannot raise her arms very high. (Tr. at 45-46.) She also has difficulty with her right knee, which "will throw" her, and she has degenerative arthritis in her left hip. (Tr. at 46.)

She has difficulty with stairs, and cannot go up into her attic or down into her basement anymore. (Tr. at 52.) Claimant estimated that she could walk half a block and sit for twenty-five to thirty minutes before she needs to get back up. (Tr. at 53.) She explained that she cannot sit without having her legs straight for a while or bending them. (Tr. at 53-54.) She estimated that she can lift about ten pounds. (Tr. at 54.)

Claimant testified that she has depression, she cries easily, has short memory problems, and trouble concentrating. (Tr. at 47.) She stated she cried daily, lasting about half an hour at a

time. (Tr. at 48.) She complained that she cannot finish tasks due to concentration problems. (Id.) She also testified that she has problems sleeping, that she needs several pillows propped up to help her breathing and that she cannot lay in one position for any length of time. (Tr. at 48-49.) She rises around 4:00 a.m. because she just cannot lay in bed any longer, and she does not sleep soundly when she does sleep. (Tr. at 49.) During the day, she feels fatigued. (Id.) Claimant testified that she must sit and rest every half hour during the day to ease her back and knees pain. (Id.) She has to sit and stand repeatedly throughout the day, and take naps twice a day for an hour or two. (Tr. at 50.) Claimant stated that she has pain every day, and that it averages a 7 out of 10 initially, until she takes her medication, which helps "some." (Tr. at 50.)

Claimant has nitroglycerine for emergencies and takes aspirin daily; she also uses a nebulizer four times a day and an inhaler twice a day. (Tr. at 45.) For her pain, Claimant uses a TENS unit every other day, and that it helps "some." (Tr. at 46.) Claimant stated that she has side effects from Lyrica: she has had to have her teeth pulled, her hair falls out, she has gained weight and experienced memory trouble, but she is unable to wean down from it because she will get sick to the point of having to go to the hospital. (Tr. at 47.)

Claimant stated that she washes a few dishes, and has a small kitchen and bathroom so she sweeps the linoleum floors. (Tr. at 42.) She mostly takes her dog out to go to the bathroom; she is teaching her 27-year old son to do laundry. (Id.) On a good day, she can go outside in the yard, dust a little and read a book without having to stop and re-read what she already read. (Tr. at 51.) On a bad day, she is "literally up and down" and walks the floors mostly, but is constantly up and down and cries a lot. (Id.)

Claimant testified that she had a license and could drive, but in the last five or six years she

started having panic attacks for no reason and that she was in a bad accident in 2006 or 2007. (Tr. at 43.) She has had a handicap placard for about five years that was prescribed by Dr. Wagner. (Tr. at 46-47.) She goes to the DMV to get the placard. (Tr. at 47.)

She grocery shops with her sister once a week, but she does not bring in the groceries, her son does. (Tr. at 54, 55-56.) She used a computer for email and searching the internet. (Tr. at 48.) During the day, she read, crocheted some, did puzzle books, and watched television. (Tr. at 55.) She can brush her teeth and bathe herself, but has learned to "roll out of the bathtub." (Tr. at 56.) Her kids will braid her hair because she is unable to raise her arms to keep up with it. (Id.) She has no difficulties using the toilet. (Tr. at 56-57.)

She used to enjoy quilting, walking, playing tennis, writing and attending church but does none of these things anymore. (Tr. at 57.) She testified that she could not do a job that required standing six hours out of an eight-hour day or sitting two hours out of an eight-hour day because of her spine; she takes a generic form of Valium to help with the "Charley Horses" in her back. (Tr. at 58.)

Claimant testified that she has several bulging discs and that one has ruptured and she will have to have both of her knees replaced. (Tr. at 59.) She testified that she knows she has another bulging disc because she can feel it sticking out; she has had no specialist treat her because her orthopedist moved away in 2007, and her neurologist moved away in 2011, so she has left everything up to her primary care physician. (Tr. at 60-62.)

Douglas Prutting, Vocational Expert ("VE") Testimony:

The ALJ provided a hypothetical to the VE regarding an individual with Claimant's age, education, and past work experience; who could perform work at the light exertional level but

could, at will, alternate between sitting and standing; who could occasionally climb ramps or stairs but who could never climb ladders, ropes, or scaffolds; who could occasionally balance, stoop, kneel, or crouch, but who could not crawl; who must avoid concentrated exposure to extreme heat and cold, excessive vibration, fumes, dusts, gases, and poorly ventilated areas; and who must avoid exposure to unprotected heights and hazardous machinery. (Tr. at 64-65.) The VE confirmed that such an individual could perform work found in significant numbers in the national economy, including the jobs of assembler, cashier 2, and companion; the VE further testified that each of these jobs have sit/stand options. (Tr. at 65-66.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Application of Rule 201.12:

Claimant's sole argument is that she "grids out" as of her fiftieth birthday as being relegated to the sedentary exertional level pursuant to Medical-Vocational Guidelines Rule 201.12. (Document No. 9 at 5-7.) As an initial matter, the undersigned notes that there was no evidence in the underlying record that supports a finding that Claimant is limited to sedentary work, and that in order for this Court to find otherwise is tantamount to re-weighing the conflicting evidence, which the ALJ has the duty to resolve, not this Court. See SSR 96-8p; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Nevertheless, pursuant to Rule 201.12[5], an individual limited to sedentary work, who is closely approaching advanced age, being 50 to 54 years old, with a high school graduate education or more which does not provide for direct entry into skilled work, and whose previous work experience is unskilled or none directs that the decision find the individual "disabled." 20 C.F.R.

---

[5] The undersigned notes that at the administrative hearing, the VE characterized Claimant's prior relevant work as skilled (Tr. at 22, 64.), thus, Rule 201.12 is inapplicable, nevertheless, the ALJ deemed the transferability of job skills immaterial, as none of the Rules applied in his analysis. (Tr. at 23.)

Part 404, Subpart P, Appendix 2. However, an individual of the same background, but who is limited to light work, Rule 202.13[6] directs that a decision find the individual "not disabled." Id.

In this case, the ALJ determined that Claimant was capable of less than a full range of light work because she had additional limitations, and therefore, appropriately asked the vocational expert "[t]o determine the extent to which these limitations erode the unskilled light occupational base[.]" (Tr. at 23.) Given the factors provided by the ALJ, the vocational expert opined that an individual such as Claimant could "perform the requirements representative occupations such as: Assembler; Cashier 2; and Companion." (Id.) Further, the ALJ determined despite the vocational expert's testimony being inconsistent with the Dictionary of Occupational Titles, based on his education, expertise, and experience, he opined that the number of jobs would be reduced by twenty-five percent for the small parts assembler job and fifty percent for the cashier 2 job due to the sit and stand option. (Id.) Having further agreed with the vocational expert's testimony, the ALJ properly concluded that the finding "not disabled" was therefore appropriate under the framework of the Medical-Vocational Guidelines. (Tr. at 23-24.)

As noted *supra*, there simply was no evidence of record that supported Claimant's contention that she was limited to sedentary work. See, generally, Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (stating that a hypothetical question is unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence); see also, Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (concluding that an ALJ's hypothetical question need only include those limitations supported by the record). In accordance with this Court's duty to

---

[6] As discussed *supra*, Rule 202.14 concerns an individual of the same characteristics as Claimant, with prior relevant work as skilled, without transferable skills, and directs a decision finding such an individual "not disabled." Indeed, this is precisely what the ALJ found in this case. (Id.)

scrutinize the record as a whole in order to determine if the Commissioner's conclusions were rational, as noted *supra*, the undersigned **FINDS** that the ALJ's consideration of and resolution of Claimant's limitations and abilities were "rational" and based upon substantial evidence. Oppenheim v. Finch, 495 F.2d at 397. The undersigned further **FINDS** that the ALJ's decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand as articulated in her Brief in Support of Judgment on the Pleadings (Document No. 9.), **GRANT** the Defendant's request to affirm the decision below (Document No. 10.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 27, 2017.

Omar J. Aboulhosn
United States Magistrate Judge